**Susan WASHBURN, Plaintiff,**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, et al., Defendants.**

**No. C–1–96–749.**

United States District Court,
S.D. Ohio,
Western Division.

Oct. 9, 1998.

---

John Anthony Rebel, Cincinnati, OH, for plaintiff.

Jack Frederick Fuchs, Thompson Hine & Flory—1, Cincinnati, OH, for defendant.

## ORDER

DLOTT, District Judge.

This matter is before the Court on Plaintiff's Motion for Summary Judgment Against UNUM Life Insurance Company of America (doc. # 18) and Defendant UNUM's Motion for Summary Judgment (doc. # 19), both pursuant to Rule 56 of the Federal Rules of Civil Procedure. In essence, both parties seek judgment on Plaintiff's ERISA claim, Claim I of the Amended Complaint (doc. # 7), for unpaid long term disability payments. Plaintiff also alleges a breach of fiduciary duties in Claim I. For reasons discussed below, the Court cannot review ERISA claims for unpaid benefits pursuant to Rule 56. Instead, the Court must review the administrative record and make findings of fact and conclusions of law accordingly. On the basis of the administrative record, the Court hereby **UPHOLDS** Defendant UNUM Life Insurance Company's denial of long term disability benefits to Plaintiff Susan Washburn to the extent that it is held that Provident Life and Accident Insurance Company remained the primary payor of benefits after April 26, 1995. Further, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment on the claim alleging breach of fiduciary duties.

## I. BACKGROUND

Susan Washburn was a registered nurse employed by Bethesda Hospital beginning on September 25, 1989. She was employed as a nurse manager at Bethesda from November 1990 through September 1993. Washburn began to suffer symptoms of Lyme Disease in October 1992 and she was no longer able to work full-time. Washburn began receiving Long Term Disability ("LTD") payments from Bethesda's insurance carrier, Provident Life and Accident Insurance Company ("Provident"), on January 14, 1993. On May 1, 1994 Bethesda Hospital switched LTD insurance carriers from Provident to UNUM Life Insurance Company of America ("UNUM"). Provident continued to pay Washburn LTD benefits even after it was no longer the LTD carrier for Bethesda.

Prior to October 1992, the onset of her disability, Washburn was able to work full-time. Her physician limited her to twenty hours per week beginning in September 1993 and sixteen hours per week in June 1994. On February 17, 1995 Bethesda reorganized and eliminated Washburn's part-time position. As part of her severance package, Bethesda continued to pay LTD

premiums to UNUM and wages to Washburn through May 4, 1995. Washburn returned to full-time employment as a nurse manager at Drake Hospital, a hospital not associated with Bethesda, on March 13, 1995. Provident ceased its payment of monthly LTD benefits on that same day. Shortly thereafter, Washburn suffered a relapse of her Lyme Disease and was forced to leave employment at Drake Hospital on April 26, 1995. Washburn then sought to reinstate her LTD benefits from Provident and UNUM. Both denied coverage. UNUM claimed that it had no liability because Provident was responsible for the benefits. Washburn filed suit against Provident, UNUM, and Bethesda, but has subsequently settled with Provident and Bethesda.

## II. PRELIMINARY ISSUES

### A. Standard of Review

■ The Court's review of UNUM's interpretation of its Policy and of Washburn's eligibility for benefits under the UNUM Policy is to be conducted under an arbitrary and capricious standard. This ERISA action is one under 29 U.S.C. § 1132(a)(1)(B), a civil action brought by a beneficiary to recover benefits and receive rights due under the benefits plan. In reviewing actions brought under § 1132(a)(1)(B), the Court is guided by principles of trust law. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir.1996).

■ Under trust principles, de novo review is appropriate only when the trust, or here the ERISA policy, does not give the trustor or administrator discretionary power to interpret the trust or policy. *See Bruch,* 489 U.S. at 115, 109 S.Ct. 948. However, when the plan or policy grants the administrator the power to determine eligibility or benefits, or to construe the terms of the plan, the deferential arbitrary and capricious standard is appropriate.

*See id.; Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir.1991). "[A]n ERISA benefit plan administrator's decisions on eligibility for benefits are not arbitrary and capricious if they are 'rational in light of the plan's provisions.'" *Miller,* 925 F.2d at 984 (citing *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th Cir.1988)). In the case at bar, the UNUM Policy expressly gave the Company discretionary authority "both to determine an employee's eligibility for benefits and to construe the terms of this policy." (WA 00025). Therefore, the arbitrary and capricious standard is appropriate.

■ Deciding to apply an arbitrary and capricious review does not end the inquiry, though. First, the Court recognizes that UNUM, as the insurer, faces a substantial conflict of interest in deciding whether or not to find a participant eligible for benefits. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as 'a facto[r] in determining whether there is an abuse of discretion.'" *Bruch,* 489 U.S. at 115, 109 S.Ct. 948 (citing *Restatement (Second) of Trusts* § 187, comment d (1959)). Designating the conflict of interest as a factor to be considered does not, however, require the arbitrary and capricious standard to be abandoned altogether. *See Borda v. Hardy, Lewis, Pollard & Page, P.C.,* 138 F.3d 1062, 1069 (6th Cir.1998). Rather, the Court's task is to determine if the administrator's decision was reasonable in light of the conflict.

Second, after deciding that the company had discretionary authority under the benefit plan, the Court must determine the contours of the discretion. "'A plan administrator has exactly the amount and type of discretion granted by the plan, no more and no less.'" *Wulf v. Quantum Chem. Corp.,* 26 F.3d 1368, 1373 (6th Cir. 1994) (quoting *Anderson v. Great West Life Assurance Co.,* 942 F.2d 392, 395 (6th Cir.1991)). Under the plain language of the UNUM Policy, UNUM had discretion

to determine eligibility for benefits and to construe the terms of its own policy. UNUM did not have discretion to determine eligibility under or to interpret the terms of the Provident LTD Policy. Therefore, the Court's review of UNUM's interpretation of the Provident Policy will be de novo.

## B. Procedures for Review

■ The recent Sixth Circuit case, *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609 (1998), has changed the procedures used to review ERISA actions. The Court must proceed as follows:

1. As to the merits of the action, the district court should conduct a de novo [or an arbitrary and capricious] review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties arguments concerning the proper analysis of the evidentiary material contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.

2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.

3. For the reasons set forth above, the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.

*Wilkins,* 150 F.3d at 619 (Gilman, J. concurring and joined by Ryan, J.) This concurrence, which constituted the opinion of the appellate court for this issue, expressly referred only to de novo review. The Court finds it equally applicable to arbitrary and capricious review, a more defer-

ential standard. The Sixth Circuit ruled that for both the de novo and the arbitrary and capricious standards, a district court can review only the materials an administrator had available at the time the final decision. *See Miller,* 925 F.2d at 986.

## III. LEGAL ANALYSIS

### A. Plaintiff's Claim for a Breach of Fiduciary Duties

Contrary to Washburn's assertion, Washburn cannot bring a claim for a breach of fiduciary duty when 29 U.S.C. § 1132(a)(1)(B) provides adequate remedy. Washburn cites *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), for the proposition that the Court can provide equitable relief under 29 U.S.C. § 1132(a)(3)(B)(i) if there is not statutory relief under § 1132(a)(1). The Court disagrees with Washburn's reading of *Varity.*

■ In *Varity* the Supreme Court stated in dicta that "where Congress elsewhere has provided adequate relief for a beneficiaries injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" 516 U.S. at 515, 116 S.Ct. 1065. The Sixth Circuit has clearly ruled that where § 1132(a)(1)(B) allows a plaintiff to bring a lawsuit to challenge a denial of plan benefits to which she claims entitlement, she does not also have a right to claim a breach of fiduciary duty under § 1132(a)(3). *See Wilkins,* 150 F.3d at 615; *Weiner v. Aetna Health Plans of Ohio, Inc.,* no. 97–3136, 1998 WL 381642, at *5 (6th Cir. June 23, 1998).

Accordingly, Plaintiff's Motion for Summary Judgment is **DENIED IN PART** and the Court holds that Plaintiff cannot bring a claim for a breach of fiduciary duties under ERISA.

### B. Plaintiff's Claim for Unpaid Benefits

Washburn's claim for unpaid benefits is considerably more complicated than her

claim for breach of fiduciary duty. The claim will be analyzed in the following manner. UNUM's Policy will be examined under an arbitrary and capricious review standard with a watchful eye toward's UNUM's inherent conflict 'of interest. The Court will determine, first, what coverage the UNUM Policy independently provided Washburn, and second, what coverage it provided Washburn in relation to Washburn's coverage under the Provident Policy. The Court will then determine what coverage Provident should have provided to Washburn.

### 1. Plaintiff's Coverage Under the UNUM Policy

The key to understanding the coverage the UNUM Policy provided to Washburn is the Continuity of Coverage clause because Washburn did not otherwise qualify for LTD benefits under the UNUM Policy. To qualify as an eligible class member for LTD benefits under the UNUM Policy, the enrollee had to be an active full-time employee. (WA 00023). Active employment required working at least 36 hours per week. (WA 00024). At all times after May 1, 1994, the date UNUM became the LTD carrier for Bethesda hospital, Washburn worked less than 36 hours per week at Bethesda. Therefore, the Court finds UNUM's determination that Washburn did not independently qualify for LTD benefits under the UNUM policy to be reasonable.

Even under the arbitrary and capricious standard of review, however, the Court does not find UNUM's narrow interpretation of its Continuity of Coverage [1] clause to be reasonable. UNUM argues that the Continuity of Coverage clause establishes coverage "based on the *terms* of the Provident Policy." (UNUM's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (doc. # 23), p. 8 (emphasis added)). It argues that the UNUM Policy does not provide coverage unless the prior carrier, Provident, would have provided coverage. Keeping in mind UNUM's inherent conflict of interest as the LTD provider and policy interpreter, the Court finds this to be an unreasonable interpretation. Under the plain language of the clause, the amount of the "benefit payable" is contingent on the Provident Policy. The language, "this policy will provide coverage" creates coverage according to the terms of the UNUM Policy when a person meets the two delineated criteria, as Washburn clearly does. "Benefit payable" refers only to the dollar amount to be paid once coverage is provided.

UNUM's reading of the Continuity of Coverage clause would substantially eliminate the purpose of the clause. The clause is intended to provide coverage to persons like Washburn. Washburn became disabled while covered by Provident, the prior carrier, and was awarded LTD benefits. The Continuity of Coverage clause anticipates that such persons otherwise would not be able to qualify for LTD benefits under the UNUM Policy because their disability would necessarily prevent them from working enough hours to qualify as an active full-time employee. The reasonable interpretation of the Continuity of Coverage clause is that it establishes coverage under the UNUM Policy as a continuation of the Provident coverage in the amount of the Provident coverage.

UNUM also argues that its coverage of Washburn terminated on Febru-

---

1. "CONTINUITY OF COVERAGE

In order to prevent loss of coverage for an employee because of a transfer of insurance carriers, this policy will provide coverage for certain employees as follows.
Failure to be in Active Employment Due to Injury or Sickness
This policy will cover, subject to premium payments, employees:

    1. insured with the prior carrier at the time of transfer; and
    2. who are not in active employment due to injury or sickness.
The benefit payable will be that which would have been paid by the prior carrier had coverage remained in force, less any benefit for which the prior carrier is liable." (UNUM Policy WA 00036, 00037).

ary 17, 1995, the date Bethesda eliminated Washburn's part-time position, or at the latest on March 13, 1995, the date Provident ceased its LTD payments to Washburn. UNUM's interpretation is not reasonable to the extent that UNUM's argument for the later date is based on its erroneous judgment that the Continuity of Coverage clause limits its coverage to the terms of Provident's coverage. Termination of UNUM's coverage has to be based on the "Termination of Employee's Insurance"[2] clause in the UNUM policy. The plain language of the clause states that insurance will be continued for disabled employees such as Washburn while benefits are being paid and that employers can continue an employee's insurance by paying the required premiums for employees on a leave of absence. Washburn was paid benefits by Provident until March 13, 1995 and Bethesda paid LTD premiums to UNUM for Washburn through May 4, 1995 as part of her severance package.

Under the plain language of the policy, UNUM's coverage did not end in February 1995 when Washburn's position was eliminated because Provident continued paying LTD benefits until March 13, 1995. The crux of the issue then becomes whether the period from February 17 to May 4, 1995—the term of the severance package from Bethesda—is a "leave of absence." In a June 10, 1996 letter from UNUM to Washburn's counsel, UNUM concluded without analysis that Washburn "was terminated and [not] placed on 'temporary lay-off' by her employer." (WA 00006).

The administrative file given to the Court does not contain a definitive answer from Provident regarding whether the severance term is a leave of absence. However, the Bethesda Hospital, Inc. Employee's Pension Plan, defines "leave of absence" and that definition indicates that the severance term was a leave of absence.[3] Leave of absence is defined as "the period of absence from active service with [Bethesda] (with or without pay, including a lay-off) which has been consented to by [Bethesda] and which is in accordance with uniform rules applicable to all individuals similarly situated." (Exhibit C of Plaintiff's Amended Complaint (doc. # 7), para. 1.18). In terminating Washburn's part-time position in February 1995, Bethesda consented to provide Washburn with a severance package. That package included paying LTD premiums to UNUM through May 4, 1995. UNUM accepted these premiums. In discussing leaves of absence, the UNUM Policy states that employee insurance will be continued during absences approved and premiums paid by the employer.[4] Therefore, the Court con-

---

2. "TERMINATION OF EMPLOYEE'S INSURANCE

An employee will cease to be insured on the earliest of the following dates:

. . .

5. the date employment terminates. Cessation of active employment will be deemed termination of employment, except:
   a. the insurance will be continued for a disabled employee during:
      i. the elimination period; and
      ii. while benefits are being paid.
   b. the employer may continue the employee's insurance by paying the required premiums, subject to the following:
      i. Insurance may be continued for the time shown in the policy specifications for an employee:
         a) temporarily laid off; or
         b) given leave of absence."

(UNUM Policy WA 00040).

3. This document (Exhibit C of Plaintiff's Amended Complaint (doc. # 7)), although not presented as part of the administrative record provided by UNUM, can be reviewed by the Court in making its determination. Common sense and fairness dictate that UNUM be held to have knowledge of the Pension Plan statement that its covered employer, Bethesda, gives to its employees.

4. "10. Continuation of Employee Insurance During Absences

cludes that UNUM's coverage could terminate no earlier than May 4, 1995, the last day of the severance term.

UNUM would argue that even conceding the foregoing, it is relieved under the terms of the Continuity of Coverage clause from paying benefits to the extent that Provident is required to pay benefits.[5] Washburn has admitted this much in her briefs stating that, at least from the period of May 1, 1994 through March 12, 1995,[6] there was dual coverage under both the Provident and UNUM policies with Provident being the primary payor. (Plaintiff's Motion for Summary Judgment (doc. # 18), p. 11). UNUM's strongest defense against its liability for benefits resuming after Washburn was forced to leave Drake Hospital in April 1995 is that Provident was primarily liable for those benefits. The Court, therefore, turns its attention to Provident's Policy.

### 2. Plaintiff's Coverage Under the Provident Policy

The Court's review of Provident's Policy is de novo, but the Court is limited to the administrative record for the reasons discussed in Part II above. The key question the Court must address is what effect Washburn's short term of employment at Drake Hospital had on her rights to receive LTD benefits from Provident. Provident ceased being the LTD carrier for

Bethesda on May 1, 1994, but Provident continued to pay LTD benefits to Washburn up until her start date at Drake Hospital on March 13, 1995.

Provident's liability for providing benefits to Washburn after April 26, 1995, the date Washburn left Drake, hinges, on whether Washburn's employment at Drake was a "temporary return to active work" under the Provident Policy. Under the Provident Policy, if a disabled employee temporarily returns to active work, but is able to remain for less than 180 days due to a recurrence of the disability, the recurrence is considered a continuation of the benefit period.[7]

■ The parties have argued heatedly and inconsistently about whether Washburn's employment at Drake Hospital constituted "active work" under the Provident Policy. Active work is defined in the Provident Policy to mean that "you are performing each of the material duties of the occupation that you regularly perform for the Employer at the Employer's usual place of business." (WA 00074). This definition is ambiguous and capable of two readings. First, the definition could have two independent requirements for qualifying as "active work": (1) performing the material duties of the occupation you regularly perform, and (2) performing those duties for the Employer at the Employer's

---

Type of Absence | Time Limit
Temporary Layoff or Leave of Absence | To a maximum of 12 months for absences approved and premiums paid by the employer."

(UNUM Policy WA 00025).

The Court notes that the UNUM Certificate, as opposed to the UNUM Policy quoted above, continues insurance only to the month following the policy month in which the leave or absence or layoff begins. (UNUM Certificate, WA 00324). However, the Certificate notes that where the Policy and Certificate conflict, the terms of the Policy govern. (UNUM Certificate WA, 00322).

5. "The benefit payable will be that which would have been paid by the prior carrier had coverage remained in force, less any benefit for which the prior carrier is liable." (UNUM Policy, WA 00037).

6. These dates are when UNUM replaced Provident as the LTD provider for Bethesda and the day before Washburn began work at Drake Hospital, respectively.

7. "If you temporarily return to Active Work during a Benefit Period, the following will apply:
   a. the allowable period of a temporary return to Active Work may not exceed a total of 180 days; and
   b. if after having returned to Active Work, you become Disabled again from the same or related cause or causes and your return to Active Work did not exceed the allowable period described above, then your Disability will be considered a continuation of the benefit period."

(Provident Policy, WA 00067).

usual place of business. Under this first reading, Washburn's employment at Drake is not "active work" because active work can only be performed at her employer's usual place of business, that being at Bethesda.[8]

The Court rejects this first reading in favor of the more liberal second possible reading in which "for the Employer at the Employer's usual place of business" merely qualifies what the material duties are of the occupation the employee regularly performed. Under this reading, Washburn's employment at Drake was "active work" because Washburn performed at Drake the material duties of nurse manager that she had regularly performed as nurse manager at Bethesda. Several maxims of contract construction lead the Court to adopt the second reading. The Court seeks to give words "their common and ordinary meaning, as a reasonable person in the position of the plan participant (not the actual participant) would have understood them." *Life Ins. Co. of North America v. Centennial Life Ins. Co.*, nos. 96–3253, 96–3301, 96–3332, 1998 WL 11041, *2, 1998 LEXIS 520, at *5–6 (10th Cir. Jan. 14, 1998). Ambiguous contract terms are to be construed against the drafter and in the way that serves the public interest. *See Restatement (Second) of Contracts*, §§ 206, 207 (1981). It is to the public's benefit to hold that disabled employees can perform "active work" temporarily at any employer without having to forfeit their LTD benefits when they suffer a relapse of their disability.

Therefore, the Court finds that Washburn was performing active work, as defined in the Provident Policy, when she was employed at Drake Hospital. This decision does not end the Court's analysis. Provident terminated monthly benefits to Washburn when she started work at Drake on March 13, 1995.[9] Even if Washburn was not eligible for coverage under another LTD group provider, her LTD benefits were not payable during her temporary return to active work at Drake.[10] If coverage under the Provident Policy continued, her benefits would have become payable again in April when she left Drake because her time at Drake was less than 180 days and she suffered a relapse of her disability. The recurrence would have been treated as a continuation of the benefit period.[11]

The next question then becomes whether or not Washburn's coverage under the

8. "Employer means the Policyholder and all subsidiaries named on the Schedule of Insurance." (Provident Policy, WA 00062). Drake is not a subsidiary of Bethesda.

9. "WHEN LTD MONTHLY BENEFITS END

LTD Monthly Benefits will automatically end on the earliest of the following when you:
1. are no longer Disabled;
...
5. temporarily return to Active Work and are covered or eligible for coverage under any other group LTD policy." (Provident Policy, WA 00066).
There was some dispute in the administrative record whether Provident terminated benefits on March 13, 1995 because Washburn no longer met the technical definition of "disabled" or whether it was due to Washburn's "temporari[ly] return to Active work and [being] covered or eligible for coverage under any other group LTD policy." The Court does not need to resolve this dispute because, either way, the result was only to terminate monthly benefits, not to end cover-

age under the Provident policy. As explained in the main text, monthly benefits could be restarted if Washburn suffered a relapse of her disability ending her return to active work.

10. "Effect of a Temporary Return to Active Work

If you temporarily return to Active Work and do not exceed the allowable period, the following will apply to the payment of benefits:
...
2. the LTD Monthly Benefit Amount will not be payable during a temporary return to Active Work;
3. during a period in which you temporarily return to Active Work, coverage under the Policy will automatically end on the date you become covered or eligible for coverage under any other group policy;
...."
(Provident Policy, WA 00068).

11. See footnote 7 (para.b) for the text of the Policy clause.

Provident Policy was terminated when she started work at Drake. This is not the same question as whether monthly benefits were terminated during the term of her temporary return to active employment. The Provident Policy states that "during a period in which you temporarily return to Active Work, coverage under the Policy will automatically end on the date you become covered or eligible for coverage under any other group policy." (WA 00068). Under this clause, Washburn's coverage under the Provident Policy did not terminate. Although Washburn may well have been covered or eligible for coverage under the UNUM Policy during her return to active work at Drake, she did not "become" covered or eligible during that limited time span. This clause was intended to terminate the LTD coverage of a first employer when the employee becomes eligible for coverage under the LTD plan of the second employer. The parties agree that Washburn never became eligible for LTD benefits from Drake Hospital's LTD carrier. Therefore, Washburn's monthly benefits may have ended during Washburn's employment at Drake, but her coverage never terminated, and Washburn was qualified for a continuation of her benefits when she left Drake in April 1995 because of the disability relapse.

### 3. Summation of Plaintiff's Claim for Unpaid Benefits

Provident's coverage of Washburn was not terminated during Washburn's temporary return to active Work at Drake Hospital. Provident was responsible for continuing monthly benefits after April 26, 1995 when Washburn left Drake Hospital because of a relapse of her Lyme Disease. UNUM's coverage of Washburn was not based on the terms of Provident's coverage, but nonetheless, UNUM did not have to make monthly benefit payments to the extent that Provident was liable for those payments. Therefore, the Court's conclusion that Provident was responsible for monthly benefits after April 26, 1995 necessitates concluding that UNUM was justified in denying Washburn's claim for benefits.

### C. Plaintiff's Conversion Claim

Plaintiff's Amended Complaint contains a claim, in the alternative, against Defendant UNUM for failure to pay benefits under the UNUM Conversion Policy. This Order expresses no opinion regarding that claim.

### IV. CONCLUSION

For the reasons stated above, the Court hereby:

(1) **DENIES** Plaintiff's Motion for Summary Judgment (doc. # 18) regarding the breach of fiduciary duties alleged in Claim I of the Amended Complaint (doc. # 7); and

(2) **UPHOLDS** Defendant UNUM's denial of long term disability payments to Plaintiff Susan Washburn in so far as it is held that Provident remained the primary payor of Washburn's LTD benefits after April 26, 1995.

**IT IS SO ORDERED.**